IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

JANE DOE and J. DOE, as parent, natural guardians
and next friends of JOHN DOE,

      Plaintiffs,

v.                                   CIVIL ACTION NO.  3:21-0031

CABELL COUNTY BOARD OF EDUCATION and
JASON CURRY,

      Defendants.

MEMORANDUM OPINION AND ORDER

Pending is Defendant Cabell County Board of Education's Motion for Summary Judgment. ECF No. 214. For the reasons that follow, the Defendant's motion is **GRANTED IN PART AND DENIED IN PART.**

## I.  BACKGROUND

### A.  Factual Summary

John Doe is minor child with special needs. He has an autism diagnosis, is non-verbal, and requires assistance with tasks of daily living, including toileting.  IEP (Jan 11, 2019) at 6, ECF No. 217, at 177–97. *see* J. Doe Dep. 13:11–25:2, ECF No. 217-17. He has a history of self-harming behavior, and, at times, disruptive behaviors. IEP (Jan 11, 2019), at 4, 6 ("When he is not being worked with one on one and there is something accessible he will often run, climb, tip chairs over, and dump materials onto the ground.").

At all relevant times, John Doe has been a student of Cabell County Board of Education's ("CCBOE") public schools. Due to his disability and high level of need, John Doe requires a one-on-one aide. *See id.* at 6.

John Doe started attending Milton Middle School in August of 2019, when he was 12 years old. He was placed in Kathleen Ridgeway's classroom, and CCBOE assigned Defendant Jason Curry as John Doe's one-on-one aide. Curry's Suppl. Ans. to Plfs' Req. for Admission 1, ECF No. 221-2; Curry Dep. 22:23–24:9, ECF No. 217-7. There were two other special needs students in the classroom. Chapman Dep. 8:11–20, ECF No. 217-4. Amy Chapman was assigned as the one-on-one aide for one of John Doe's classmates. *Id.* at 7:4–16. Shannon Cotton[1] was assigned as the "classroom aide." *Id.* at 7:22–8:10. Because there were only three students in the classroom, Cotton testified that she functionally served as a one-on-one aide for the remaining child; however, she also assisted with the other children, including John Doe. Cotton Dep. 28:1–15, 30:11–31:5, ECF No. 217-8.

It is undisputed that prior to October and November 2019, John Doe engaged in some behavior that could be characterized as sexual. For example, John Doe's parents agree that the child likes to "rub" the underarms of certain women, but he does not do that to men. Jane Doe Dep. 25:14–19, ECF No. 217-6; J. Doe Dep. 32:14–19.

He has a history of taking off his pants at school that dates back to August of 2017. *See, e.g.*, 2017 I/DD Waiver Notes ECF No. 217, at 63–76. On occasion that behavior has been described as sexual and/or related to possible puberty. *See, e.g.*, Dec. 2017 Note of Dr. Bryant

---

[1] It appears that since the time of the incidents alleged in the Amended Complaint, Shannon Cotton has married and now goes by the name Shannon Williams. For the sake of clarity and because she is most commonly referred to as "Cotton" in the parties' respective evidence, that is how the Court will refer to her herein.

Melvin 1, ECF No. 217, at 208–13. At other times, it is simply mentioned as one of his "behaviors." *See* June 2018 IPP ¶ 6, ECF No. 217 at 79–111 (listing "takes off clothes at inappropriate times" as one of John Doe's behaviors); Sept. 2018 IPP at 11, ECF No. 217 at 112–40 (noting that John Doe "does often take off his clothes during visits but is always well dressed beforehand").

CCBOE has also produced statements of school employees who have witnessed John Doe attempting to "hump" or "grind his genitals" on adults. *See* Armentrout Aff. ¶ 7, ECF No. 217-10; Brown Aff. ¶ 6, ECF No. 217-18; Chapman Aff. ¶ 7, ECF No 217-11; Holley Decl. ¶ 8, ECF No. 217-9;[2] Mowdy Decl. ¶ 6, ECF No. 217-12.[3] These accounts are generally vague and do not describe John Doe engaging in these behaviors while on an adult's lap. *See* Holley Decl. ¶ 7 ("[John Doe] never attempted to straddle me or sit with his pelvis towards my pelvis."); Mowdy Decl. ¶ 6 ("During his older years at Milton Elementary, [John Doe] would sometimes attempt to press his pelvic area against teachers and aides [sic] leg[s] in the classroom.").

It is also well documented that John Doe liked sitting on laps. *See Id.* at ¶ 5 ("[John Doe] was a lap-sitter based on my experience with him and would often attempt to sit on someone's lap, with legs to the side, if he came across aide or teacher seated close to him. This was age appropriate when he was with us in Elementary School."); Wiseman Aff. ¶ 5, ECF No. 217-13 ("During my time with [John Doe] at Milton Middle School, I witnessed [John Doe] attempt to sit on other's laps at times."); Eplin Aff. ¶ 7, ECF No. 217-14 ("I was the bus aide on the bus [John Doe] rides to and from school every day and he attempted to sit on my lap frequently."); Chapman Aff. ¶¶ 6,

---

[2]    Becky Holley and Stephanie Mowdy's statements are labeled an "affidavits," however, the documents are not notarized or otherwise formally sworn before an officer authorized to administer oaths. Accordingly, the Court characterizes these documents as "declarations."

[3]    *See* Note 2, *supra*.

9. It is undisputed that the lap-sitting described by CCBOE's witnesses was not John Doe sitting in the laps of adults in the "straddle position."  Wiseman Aff. ¶ 5; Eplin Aff. ¶ 7.

Despite the statements of these CCBOE employees, John Doe's parents testified that although he engaged in lap-sitting when he was younger, he did not frequently sit on laps during the time in question. *See* Jane Doe Dep. at 23, 26; J. Doe Dep. at 37–38. Likewise, Cotton testified that while she witnessed him sitting on Curry's lap, she did not witness him sitting on the laps of others. Cotton Dep. 33:11–34:13.

Regardless of the frequency, it appears that once he matriculated to Milton Middle School, John Doe's lap sitting was not considered age appropriate at school and that behavior was targeted for extinction. *See* Ridgeway-Levisay Emails 1, ECF No. 217, at 2–3.

As early as October 30, 2019, Ridgeway began raising concerns about Curry to CCBOE's Special Education Supervisor Mindy Levisay via email, writing,

> I think we need some observation in our room and some input on how we could improve. There is an aid[e] that may need more training. My attempts are failing. Please get back to me on this.

Ridgeway-Levisay Emails, at 2. Levisay responded, "Who is the aide and what problems are you having? Have you discussed this with Mr. Mann?" *Id.* at 2.

Ridgeway confirmed that she had spoken with Curt Mann, the principal of Milton Middle, continuing, "[h]e is just a young one on one aid with a very involved student that I just felt needed extra guidance. He is not receptive to my suggestions. Was looking for a different perspective on how to help him." *Id.*

Two days later, Levisay asked for more specific information from Ridgeway. *Id.* On November 4, 2019, Ridgeway provided the following:

> There just seems to be a lot he is not willing to do. He was given constant verbal reminders and then I gave him a written schedule that he never followed. He put it away in the student[']s work box right after I gave it to him and never referred to it

or checked it off once. I am also trying to teach socially appropriate behavior to the student such as not just walking up to people and randomly tickling them and not sitting on adult laps. *He will tickle the student and allow him to sit on his lap and those are behaviors I am trying to ride and replace and he has been reminded over and over.* He has also been on his phone a lot when outside with the student. The student is a runner and cannot be trusted. He saw the original e-mail I sent you and claim it was on the overhead but I do not believe it was. His student is often behind my desk and I think he read it while moving him from the area. He then went and discussed the e-mail with Mr. Chapman. I have confronted him (aid[e]) about it. I let him know that it is nothing personal only work related. I had talked to Mr. Mann and Mrs. Cooley.[4]

*Id.* at 1 (emphasis added).

On November 14, 2019, Levisay observed Curry in Ridgeway's classroom. *See* Levisay Observation Note, ECF No. 221-1 at 3–4. During that visit, Curry relayed to Levisay "that others in the room weren't happy with him." *Id.* at 4. The only coaching Levisay provided Curry was to follow the instructions of the teacher. *Id.* Levisay's note concluded with the statement, "[a]fter the observation I stopped and talked to Mr. Manns [sic] and he ensured [sic] me he would keep an eye on the situation." *Id.*

The record suggests that Ridgeway talked not only to Mann and Levisay regarding Curry but also to Assistant Principal Cooley. *See* Cooley Dep. 26–32 ECF No. 221-3. Cooley testified that she further reported concerns about Curry's unreceptiveness to Ridgeway's instruction to Mann. *Id.* at 31.

Whether or not Curry ever received any counseling from Ridgeway or Mann is contested. Ridgeway and Mann both testified that they talked to Curry about not allowing John Doe to sit on his lap. Ridgeway Dep. 9:20–10:6, ECF No. 217-1 (testifying that she had spoken to Curry about it multiple times); Mann Dep. 17:4–10, ECF No. 217-2 (testifying that he counseled Curry about

---

[4]     At the time of the events described herein, Clarence "Buddy" Chapman and Kristen Cooley were assistant principals at Milton Middle School.

not letting John Doe sit on his lap in October 2019). Curry, on the other hand, testified that he was not counseled by anyone about allowing students to sit on his lap. Curry Dep. 35:12–16, 90:23–91:14.

Despite the foregoing, Curry received a favorable performance evaluation from CCBOE, signed by Cooley, on November 15, 2019. *See* Curry Evaluation, ECF No. 221-1, at 1–2.

One week later, on November 22, 2019, Cotton reported to Ridgeway that she walked into the sensory room contained within Ridgeway's classroom and found Curry molesting John Doe. Ridgeway Dep. 29:4–14.

At Ridgeway's insistence, the two women went to Assistant Principal Cooley's office. *Id.* Cooley then called Mann, who joined Cooley, Ridgeway, and Cotton in Cooley's Office. Mann Dep. 23:2–7. Mann testified that all three women were visibly upset. *Id.* at 23:4–5, 24:10–14.

Per Mann's written report, Cotton explained that when she entered the sensory room "[John Doe] was straddling Mr. Curry, who was seated, and was 'grinding on him.' She stated they were face to face. That Mr. Curry had his arms around [John Doe]'s waist and [John Doe] had his arms around Mr. Curry's neck." Investigation Report 1, ECF No. 221-1, at 13–15.

Mann reported that he immediately had Cooley "retrieve Mr. Curry" and he made phone calls to the central Board Office. *Id.*; Mann Dep. 24:19–27:10. At Deputy Superintendent Tim Hardesty's instruction, Mann placed Curry on administrative leave, pending the outcome of his investigation in the Cotton and Ridgway's report. Mann then alerted the school's resource officer, Deputy Mike Talbott about the incident. Cotton and Mann also called Child Protective Services.

After Cotton reported her observations to Mann, she provided a written statement about what she observed:

On Friday Nov. 22nd, 2019 around 2:15 pm I open the door to the snoezelen[5] room which is in our Room and Jason was sitting on the window ledge with [John Doe] straddling him crotch to crotch, [John Doe] was thrusting/jerking his hips Jason looked up at me with wide surprised eyes I stood there in shock speechless

Jason let go of [John Doe], [John Doe] jumped up and ran out of the Snoezelen, I then told him what I originally went to tell him he sat there with his legs squeezed together like as if you had to pee really bad I then left the room and Jason came out grabbed [John Doe] and left our room, I weigh straight to Mrs. Ridgeway told her what I'd seen Then we both when to Mrs. Cooley's office and told her

Cotton Report, ECF No. 221-1, at 12.[6]

Ridgeway also completed a report which described a previous incident of John Doe sitting on Curry's lap in the "straddle position" in the sensory room:

I walked into the sensory room in my classroom. Jason Curry was sitting on an armless chair. His student [John Doe] was sitting on his lap, face to face in a straddle position. Jason was holding [John Doe]'s hands and [John Doe] was bending backwards and Jason was pulling him back up.

Ridgeway Report 1, ECF No. 217, at 1. Although Ridgeway's report was completed on November 22, 2019, it states that the incident occurred on or around October 15, 2019. *Id.*

While Ridgeway later adopted the description of this October incident as akin to a non-sexual game of "upsy-daisy," Ridgeway Dep. 71:13–72:24, Mann testified that he asked her to fill out the report after asking if anything else had ever happened "sexually" or if there were previous situations "where he would be in that position," Mann Dep. 31:3–11. Regardless of how it is

---

[5]     The "snoezelen room" is what they called the sensory room inside of Ridgeway's classroom.

[6]     In the report filed by Deputy Talbott, Cotton states that when John Doe got up from Curry's lap, Curry "had his legs pinched together as if he had to urinate or was hiding an erection." Cabell County Sheriff's Office Report 3, ECF No. 221-1, at 6–9. At her deposition, Cotton confirmed that she believed Curry had an erection at the time. Cotton Dep. 62:7–10.

characterized, there was something about the November 22, 2019 incident that caused Ridgeway to remember and report the mid-October incident.[7]

Curry was also asked to write a statement about what happened in the sensory room that day. His brief statement read:

> I was in the sensory room with [John Doe] he was watching Disney + on my phone. While in the room he was sitting on my leg.

Curry Statement, ECF No. 217, at 62. As previously mentioned, Curry was placed on administrative leave that afternoon. The Cabell County Prosecutor charged Curry with Sexual Abuse in the Second Degree shortly after the November 2019 incident, and Curry was indicted in March 2021. Curry Dep. at 52:21–24.  To the Court's knowledge, those charges are still pending.

On January 8, 2020, CCBOE Superintendent Ryan Saxe sent Curry a letter finding "even if the criminal charges are removed, you have violated Policy 4210 Employee Code of Conduct and your actions unacceptable and will not be tolerated." Saxe Letter 1–2, ECF No. 221, at 25–26. The letter placed Curry on unpaid leave and informed Curry that Saxe would seek approval from the Board to terminate Curry's employment. *Id.* at 2. Curry testified that he remained on suspension until he resigned in mid-January 2020. Curry Dep. 28:18–29:23.

John Doe's parents were informed of the November 22, 2019 incident the day it happened. Mann Dep. 33:7–19.[8] Jane Doe testified that they were not apprised of the October incident

---

[7]    Accusations have been made that Cotton lied about what she saw on November 22, 2019, because she wanted Curry's job. During her deposition, Cotton clearly stated those accusations were false. She testified both that she did not want Curry's job because she did not believe she could keep up with John Doe and that even if she did want Curry's job, she would not have been able to get it, because CCBOE jobs are awarded via "a lottery." Cotton Dep. 69:13–23. Ultimately, Cotton flatly denied making up the story about Curry molesting John Doe. *Id.* at 70:14–15. Moreover, although Ridgeway states that she no longer believes Cotton is telling the truth, she does not know for certain that the allegations are false. *See* Ridgeway Dep. 46:4–10.

[8]    Jane Doe also testified that individuals within the school system shared that "they felt something was going on" and that "Jason was doing something to [John Doe.]" Jane Doe Dep.

reported by Ridgeway until they met with the Cabell County Prosecuting Attorney in February 2020. Jane Doe Dep. 54:18–55:16.[9]

John Doe's parents allege that during the time Curry was his aide, John Doe engaged in increased sexual behaviors. Jane Doe Dep. 25:6–27:21, 36:9–16; J. Doe Dep. 45:1–46:21.[10] They further testified that those behaviors largely ceased once John Doe was no longer with Curry. Jane Doe Dep. 36:18–21, J. Doe Dep. 58:1–60:14. Jane Doe reported the same to John Doe's psychiatrist. *See* Dr. Bryant Melvin Dep. 48:17–53:6.

On the other hand, the expert retained by Defendant CCBOE, Dr. Lee Elizabeth Wachtel, has opined that John Doe did not experience an increase in sexual behavior during the time he was with Curry. *See* Wachtel Report, ECF No. 217-21.

## B. Procedural History

On January 14, 2021, Plaintiffs filed their original Complaint. ECF No. 1. The now-operative Amended Complaint was filed on October 6, 2021. ECF No. 45. Both Defendants filed motions to dismiss the Amended Complaint. ECF Nos. 47, 49.

On February 24, 2022, this Court granted in part and denied in part Defendant CCBOE's motion. Specifically, the Court denied the Board's request to dismiss Counts I, II, V, VI, and VII,

---

5:22–6:6. No follow up questions were asked about this testimony.

[9]     Plaintiffs also assert that there two other concerning incidents involving John Doe that support their claims. First, John Doe was restrained by CCBOE employees on August 27, 2019. ECF No 221-1, at 18–19. Jane and J. Doe assert that they did not learn about this restraint until documentation was produced during this litigation. Second, Plaintiffs also allege that there was a "strange episode" during which Jason Curry had John Doe in the bathroom with the lights off. *See* Cotton Dep. 36:14-18. However, Cotton's characterization of the second incident is disputed by Ridgeway. *See* Ridgeway 85:7–86:10 (describing the lights as flickering for a couple seconds).

[10]     J. Doe testified that at the time John Doe was engaging in these behaviors, he was not aware of Curry's molestation, and he attributed John Doe's increased sexualized behaviors to puberty. *See* J. Doe Dep. 58:1–60:14.

but dismissed Counts IV, VIII, and IX as to the Board.[11] ECF No. 91. Accordingly, the following causes remain pending against CCBOE: Violation of 42 U.S.C. § 1983 (Count I); State Constitutional Tort (Count II); Negligence (Count III); Disability Discrimination in Violation of West Virginia Human Rights Act (Count V); Disability Discrimination in Violation of American with Disabilities Act (Count VI); and Violation of the Rehabilitation Act (Count VII).

That same day, by separate memorandum opinion and order, the Court granted in part and denied in part Defendant Curry's motion to dismiss. ECF No. 92. The Court denied Curry's requests to dismiss Counts I and V, but dismissed counts III, IV, VI, and VII. As such, the following counts remain as to Curry: Violation of 42 U.S.C. § 1983 (Count I); State Constitutional Tort (Count II); Disability Discrimination in Violation of West Virginia Human Rights Act (Count V); Civil Assault (Count VIII), and Civil Battery (IX).

CCBOE has now moved for summary judgment on all the counts that remain pending against it. ECF No. 214.

## II.  LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in

---

[11]    The Board did not challenge Count III in its Motion to Dismiss.

the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### A.  Count I: Deprivation of Rights Under 42. U.S.C. § 1983

In *Monell v. New York City Department of Social Services*, the Supreme Court held that municipalities may only be held liable under § 1983 if the plaintiff can prove the existence of an "official municipal policy" that caused the constitution deprivation. 436 U.S. 658, 694 (1978).

Defendant CCBOE argues that Plaintiffs have failed to establish the existence of an official policy or custom, as required to state a *Monell* claim. CCBOE's Mem. of Law 4–8, ECF No. 215. In response, Plaintiffs state that they "wish to make clear they do not pursue Count I against Defendant Cabell County Board of Education but instead pursue Count I against its co-Defendant and former employee, Jason Curry." Pls' Resp. 2, ECF No. 222.

Considering Plaintiffs' response, CCBOE's motion is **GRANTED** as to the § 1983 claim in Count I.

**B.  Count II: Constitutional Tort Under Article III, § 10 of the West Virginia Constitution**

Article III, Section 10 of the West Virginia Constitution provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." These due process guarantees mirror those set forth in the Fourteenth Amendment of the United States Constitution.

CCBOE argues that Plaintiffs' constitutional tort claim against it must be dismissed because "vicarious liability is inapplicable to § 1983 and related state law claims." CCBOE's Mem. of Law 8 (citing *Spry v. West Virginia*, No. 2:16-CV-01785, 2017 WL 440733, at *5 (S.D.W. Va. Feb. 1, 2017) (Johnston, J)).

West Virginia case law makes clear that a state agency or employer *can* be held vicariously liable for certain intentional acts of an employee, where the "employee was acting within the scope of his duties, authority and/or employment." Syl Pt. 12, *W. Va. Reg'l Jail & Corr. Facility Auth. v. A.B.*, 766 S.E.2d 751, 756 (W. Va. 2014). However, "[t]o the extent that such official or employee is determined to have been acting outside of the scope of his duties, authority, and/or employment, the State and/or its agencies are immune from vicarious liability." *Id.*

Accordingly, if the basis for the Plaintiffs' state constitutional tort claim is based on Curry's actions, CCBOE can only be held vicariously liable for those acts that were within the scope of Curry's duties, authority, or employment.

There is clearly a dispute as to whether allowing John Doe to sit on his lap was within the scope of Curry's employment. For example, before the Court, CCBOE argued that Curry was trained by John Doe's previous aide, Becky Holly, to have John Doe sit on his lap. This argument suggests that CCBOE believed that placing or allowing the child to sit on his lap was a part of Curry's duties.

Nevertheless, it cannot be said that the conduct which Plaintiffs seek to hold CCBOE liable for—Curry's alleged molestation of John Doe—was within the scope of his duties as a classroom aide. *See A.B.*, 766 S.E.2d at 769–70 ("There is overwhelming majority support in other jurisdictions concluding that sexual assaults committed on the job are not within the employee's scope of employment") (collecting cases in footnote); *see Montgomery Cnty. Bd. of Educ. v. Horace Mann Ins. Co.*, 860 A.2d 909, 920 (Md. 2004) ("Apart from being malicious, sexual abuse of a minor is criminal conduct that is not within the scope of a teacher's employment or authority.") (internal citation omitted); *Duyser v. Sch. Bd. of Broward Cnty.*, 573 So.2d 130, 131–32 (Fla. Dist. Ct. App. 1991) (finding school board was not liable where teacher's sexual abuse of a student was "clearly self-serving, in bad faith and outside any conceivable course and scope of employment").[12]

Accordingly, Defendant CCBOE's motion for summary judgment as to Count II is **GRANTED**.[13]

## C. Count III: Negligence

To succeed on a claim for negligence in West Virginia, "a plaintiff must establish by the preponderance of the evidence that the defendant owes him a duty, that there was a negligent breach of that duty, and that injuries received by the plaintiff resulted proximately from the breach of duty." *Jones v. Logan Cnty. Bd. of Educ.*, 881 S.E.2d 374. 383 (W. Va. 2022).

---

[12]    It is not the case that all intentional torts necessarily fall outside the scope of an employee's duties. *See A.B.*, 766 S.E.2d at 768 (setting forth the standard for determining whether conduct is within the scope of employment).

[13]    Presumably, CCBOE *could* be held liable under Art III, § 10 for its own conduct or for the conduct of other employees that was within the scope of employment. However, Plaintiffs have not advanced that argument in response to CCBOE's motion.

In its motion, CCBOE does not challenge Plaintiffs' ability to prove the Board owed them a duty or that said duty was negligently breached.[14] Instead, submits that it is entitled to judgment as a matter of law on Plaintiffs' negligence claim because "John Doe has not suffered any damages as a result of Curry's alleged conduct." *See* CCBOE's Mem. of Law, at 13. The Court rejects this contention.

CCBOE essentially argues that because John Doe is non-verbal and cannot articulate—and perhaps cannot fully appreciate—the harm he suffered, he must not have suffered at all. In addition to being callous and distasteful, this position is neither legally nor factually supported.

Legally, it is not a requirement that a tort plaintiff fully appreciate the extent of his or her injury. *See Flannery v. United States*, 297 S.E.2d 433, 438 (W. Va. 1982) ("We do not believe that the plaintiff's subjective knowledge of the extent of his loss should be controlling.").[15]

Further, contrary to CCBOE's argument, John Doe's non-verbal condition does not render Plaintiffs' claimed damages so obscure as to require expert testimony. *See* CCBOE's Mem. of Law, at 10 (citing *Jordan v. Bero*, 210 S.E.2d 618 (W. Va. 1974)). The Defendant's effort to stretch

---

[14]    At the September 11, 2023 Pretrial Conference, Defendant CCBOE argued at length that the Plaintiffs had produced no evidence to support the breach element of Plaintiffs' negligence claim. Namely, CCBOE argued that it had "no reason to believe" Curry would engage in inappropriate sexual behavior. CCBOE conceded that this argument was not contained in its motion for summary judgment. Consequently, the question of whether Plaintiffs have produced sufficient evidence of CCBOE's breach of duty will not be addressed in this order.

[15]    As the *Flannery* Court poignantly noted,

[t]he argument that the plaintiff must have an awareness of the extent of his loss as a defense to a permanent injury bears some analogy to the argument that the defendant should not be liable for injuries made more severe because of the plaintiff's preexisting ill health or disability. Thus, the one-eyed person who is blinded in his good eye should only be found half-blind. This principle has been uniformly rejected in the personal injury damage law.

*Flannery*, 297 S.E.2d at 439.

*Jordan* to the case at hand is unavailing. Indeed, *Jordan* dealt with obscure permanent and future injuries stemming from brain injuries or the like.[16] The Court is satisfied that a jury will be able to evaluate the injuries claimed by Plaintiffs without the aid of expert testimony.[17]

Factually, Plaintiffs have presented sufficient evidence for a reasonable jury to conclude that the Defendants' actions proximately caused John Doe to suffer a sexually inappropriate encounter with Curry. If true, that bodily intrusion is an injury arising from the fact of the occurrence.[18] That injury remains irrespective of whether John Doe is able to express what was done to him or whether John Doe's intellectual and emotional capacity renders him unable to categorize the molestation as "wrong."

Additionally, there is a clear dispute of fact regarding whether John Doe experienced behavioral changes after or around the time that Curry was working with him. *See* Jane Doe Dep. 25:6–27:21, 36:9–21; J. Doe Dep. 45:1–46:21, 58:1–60:14.

In sum, Plaintiffs have submitted sufficient evidence to produce a triable question of fact regarding John Doe's injuries. As such, CCBOE's motion for summary judgment as to the negligence claim in Count III is **DENIED**.

---

[16]   Before the Court, Plaintiffs made clear that they are not seeking future damages.

[17]   Moreover, as explained by the Court at the Pretrial Conference, due to John Doe's disability, any expert testimony in this case would necessarily rely on the testimony and reports of his caregivers.

[18]   Plaintiffs have also produced evidence that John Doe screamed and ran away when Shannon Cotton walked into the room. *See* Cotton Dep. 53:20–22. Plaintiffs argue that the jury could find that John Doe's scream was indicative of fear, humiliation, or emotional distress. While the Court finds this argument to be less compelling, it is plausible that Doe's response to the act could serve as a factual basis for damages.

15

**D. Counts V–VII: Disability Discrimination in Violation of the West Virginia Human Rights Act, the Americans with Disabilities Act, and the Rehabilitation Act**

With respect to Counts V, VI, and VII, CCBOE makes two arguments. First, it avers that it is immune from liability under the West Virginia Human Rights Act. Second, it argues that there is no evidence John Doe was discriminated against *because of* his disability. [19]

1. CCBOE is not immune from Plaintiff's WVHRA claim.

Defendant CCBOE argues that it is entitled to summary judgment on Plaintiffs' West Virginia Human Right Act claim because "West Virginia political subdivisions are not liable for the intentional malfeasance of their employees." CCBOE Mem., at 15 (quoting *Jones v. Bd. of Educ. of Putnam Cnty., W. Va.*, 432 F. Supp. 3d 635, 647 (S.D.W. Va. 2020)).

However, Plaintiffs' claim against CCBOE is neither a claim that CCBOE is liable for Curry's malfeasance nor is it "couched in intentional terms." *See Jones*, 432 F. Supp. 3d at 648. In fact, this Court has already determined that CCBOE is not immune from Plaintiffs' WVHRA claim. *See* ECF No. 91, at 6.

---

[19]    In CCBOE's Reply Memorandum, and at the Pretrial Conference on September 11, 2023, CCBOE argued that summary judgment is also appropriate on the disability discrimination claims because "there is no evidence John Doe was denied an educational opportunity." CCBOE Reply Mem. 9, ECF No. 228.

First, the Court declines to address that argument in this order. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response . . . they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

Second, if John Doe's allegations are true and he was molested at school, the Court would be extremely reticent to entertain any argument that he was not denied the benefits of CCBOE's education program. *See, e.g., Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 631 (1999) (discussing the identical language in Title IX requiring plaintiffs to be "excluded from participation in" or "denied the benefits of" and "education program activity" and finding that "[i]t is not necessary to show an overt, physical deprivation of access to school resources," but rather, the plaintiff has to show the discrimination or harassment they suffered was so severe that it "undermine[d] and detract[ed] from the victims' educational experience[.]").

16

2. <u>Plaintiffs have produced sufficient evidence that the discrimination John Doe suffered was because of his disability</u>.

The West Virginia Human Rights Act prohibits any owner, superintendent, agent, or employee of places of public accommodation from denying any individual "*because of* his or her race, religion, color, national origin, ancestry, sex, age, blindness or disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of the place of public accommodations." W. Va. Code § 5-11-9(6) (emphasis added).

Title II of the American with Disabilities Act provides, "[n]o qualified individual with a disability shall*, by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added).

Similarly, the Section 504 of the Rehabilitation Act states, "[n]o otherwise qualified individual with a disability in the United States . . . shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .." 29 U.S.C. § 794(a) (emphasis added).

Thus, all three disability discrimination statutes at issue in this case require plaintiffs to prove that the alleged discrimination occurred because of or due to their disabilities.

Defendant CCBOE argues that Plaintiffs have failed to produce sufficient evidence that any of the alleged conduct occurred "failed to produce any evidence demonstrating that any of the alleged misconduct took place *because of* John Doe's disability." CCBOE Reply Mem. 8, ECF No. 228.

The Court disagrees. Most of the material facts in this case are disputed. Yet, the majority of the undisputed facts surround John Doe's disability and the Defendants' knowledge thereof. It

17

is undisputed and well documented that John Doe is disabled and requires constant adult care and supervision. It is clear that John Doe was only in Curry's care because of his disability. Most significantly, the Defendants knew, as a result of his disability, that John Doe would not be able to report any abuse or mistreatment he suffered to his parents.[20] In light of these facts, it would be reasonable for a jury to conclude that John Doe would not have suffered mistreatment but for his disability.

Consequently, CCBOE's motion for summary judgment on Plaintiffs' disability discrimination claims is **DENIED**.

## IV. CONCLUSION

In light of the foregoing, Cabell County Board of Education's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** The Motion is **GRANTED** insofar as it asks the Court to dismiss Counts I and II of the Amended Complaint. The Motion is otherwise **DENIED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:        September 15, 2023

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

---

[20]     It is also undisputed that John Doe, as a non-verbal child, is particularly vulnerable to abuse. *See* Dr. Wachtel Report 3 ("Individuals with ASD are indeed at a higher risk of abuse, and there is obviously no excuse for the abuse of any individual.").