IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

**JANE DOE and J. DOE, as parent, natural guardians
and next friends of JOHN DOE,**

    **Plaintiffs,**

v.                                                                 **CIVIL ACTION NO.  3:21-0031**

**CABELL COUNTY BOARD OF EDUCATION and
JASON CURRY,**

    **Defendants.**

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Jason Curry's Motion for Summary Judgment (ECF No. 209). For the reasons that follow, the Defendant's motion is **GRANTED IN PART AND DENIED IN PART.**

## I.  BACKGROUND

**A.  Factual Summary**

John Doe is minor child with special needs. He has an autism diagnosis, is non-verbal, and requires assistance with tasks of daily living, including toileting. IEP (Jan 11, 2019) at 6, ECF No. 217, at 177–97. *see* J. Doe Dep. 13:11–25:2, ECF No. 217-17. He has a history of self-harming behavior, and, at times, disruptive behaviors. IEP (Jan 11, 2019), at 4, 6 ("When he is not being worked with one on one and there is something accessible he will often run, climb, tip chairs over, and dump materials onto the ground.").

At all relevant times, John Doe has been a student of Cabell County Board of Education's ("CCBOE") public schools. Due to his disability and high level of need, John Doe requires a one-on-one aide. *See id.* at 6.

John Doe started attending Milton Middle School in August of 2019, when he was 12 years old. He was placed in Kathleen Ridgeway's classroom, and CCBOE assigned Defendant Jason Curry as John Doe's one-on-one aide. Curry's Suppl. Ans. to Plfs' Req. for Admission 1, ECF No. 221-2; Curry Dep. 22:23–24:9, ECF No. 217-7. There were two other special needs students in the classroom. Chapman Dep. 8:11–20, ECF No. 217-4. Amy Chapman was assigned as the one-on-one aide for one of John Doe's classmates. *Id.* at 7:4–16. Shannon Cotton[1] was assigned as the "classroom aide." *Id.* at 7:22–8:10. Because there were only three students in the classroom, Cotton testified that she functionally served as a one-on-one aide for the remaining child; however, she also assisted with the other children, including John Doe. Cotton Dep. 28:1–15, 30:11–31:5, ECF No. 217-8.

It is undisputed that prior to October and November 2019, John Doe engaged in some behavior that could be characterized as sexual. For example, John Doe's parents agree that the child likes to "rub" the underarms of certain women, but he does not do that to men. Jane Doe Dep. 25:14–19, ECF No. 217-6; J. Doe Dep. 32:14–19.

He has a history of taking off his pants at school that dates back to August of 2017. *See, e.g.*, 2017 I/DD Waiver Notes ECF No. 217, at 63–76. On occasion that behavior has been

---

[1]   It appears that since the time of the incidents alleged in the Amended Complaint, Shannon Cotton has married and now goes by the name Shannon Williams. For the sake of clarity and because she is most commonly referred to as "Cotton" in the parties' respective evidence, that is how the Court will refer to her herein.

described as sexual and/or related to possible puberty. *See, e.g.*, Dec. 2017 Note of Dr. Bryant Melvin 1, ECF No. 217, at 208–13. At other times, it is simply mentioned as one of his "behaviors." *See* June 2018 IPP ¶ 6, ECF No. 217 at 79–111 (listing "takes off clothes at inappropriate times" as one of John Doe's behaviors); Sept. 2018 IPP at 11, ECF No. 217 at 112–40 (noting that John Doe "does often take off his clothes during visits but is always well dressed beforehand").

Numerous CCBOE employees declare that they have witnessed John Doe attempting to "hump" or "grind his genitals" on adults. *See* Armentrout Aff. ¶ 7, ECF No. 217-10; Brown Aff. ¶ 6, ECF No. 217-18; Chapman Aff. ¶ 7, ECF No 217-11; Holley Decl. ¶ 8, ECF No. 217-9; [2] Mowdy Decl. ¶ 6, ECF No. 217-12.[3] These accounts are generally vague and do not describe John Doe engaging in these behaviors while on an adult's lap. *See* Holley Decl. ¶ 7 ("[John Doe] never attempted to straddle me or sit with his pelvis towards my pelvis."); Mowdy Decl. ¶ 6 ("During his older years at Milton Elementary, [John Doe] would sometimes attempt to press his pelvic area against teachers and aides [sic] leg[s] in the classroom.").

It is also well documented that John Doe liked sitting on laps. *See id.* at ¶ 5 ("[John Doe] was a lap-sitter based on my experience with him and would often attempt to sit on someone's lap, with legs to the side, if he came across aide or teacher seated close to him. This was age appropriate when he was with us in Elementary School."); Wiseman Aff. ¶ 5, ECF No. 217-13 ("During my time with [John Doe] at Milton Middle School, I witnessed [John Doe] attempt to sit on other's laps at times."); Eplin Aff. ¶ 7, ECF No. 217-14 ("I was the bus aide on the bus [John Doe] rides

---

[2]  Becky Holley and Stephanie Mowdy's statements are labeled an "affidavits," however, the documents are not notarized or otherwise formally sworn before an officer authorized to administer oaths. Accordingly, the Court characterizes these documents as "declarations."

[3]  *See supra* Note 2.

to and from school every day and he attempted to sit on my lap frequently."); Chapman Aff. ¶¶ 6, 9. It is undisputed that the lap-sitting described by CCBOE's employees was not John Doe sitting in the laps of adults in the "straddle position." Wiseman Aff. ¶ 5; Eplin Aff. ¶ 7.

Despite the statements of these CCBOE employees, John Doe's parents testified that although he engaged in lap-sitting when he was younger, he did not frequently sit on laps during the time in question. *See* Jane Doe Dep. at 23, 26; J. Doe Dep. at 37–38. Likewise, Cotton testified that while she witnessed him sitting on Curry's lap, she did not witness him sitting on the laps of others. Cotton Dep. 33:11–34:13.

Regardless of the frequency, it appears that once he matriculated to Milton Middle School, John Doe's lap sitting was not considered age appropriate at school and that behavior was targeted for extinction. *See* Ridgeway-Levisay Emails 1, ECF No. 217, at 2–3.

As early as October 30, 2019, Ridgeway began raising concerns about Curry to CCBOE's Special Education Supervisor Mindy Levisay via email, writing,

> I think we need some observation in our room and some input on how we could improve. There is an aid[e] that may need more training. My attempts are failing. Please get back to me on this.

Ridgeway-Levisay Emails, at 2. Levisay responded, "Who is the aide and what problems are you having? Have you discussed this with Mr. Mann?" *Id.* at 2.

Ridgeway confirmed that she had spoken with Curt Mann, the principal of Milton Middle, continuing, "[h]e is just a young one on one aid with a very involved student that I just felt needed extra guidance. He is not receptive to my suggestions. Was looking for a different perspective on how to help him." *Id.*

Two days later, Levisay asked for more specific information from Ridgeway. *Id.* On November 4, 2019, Ridgeway provided the following:

-4-

> There just seems to be a lot he is not willing to do. He was given constant verbal reminders and then I gave him a written schedule that he never followed. He put it away in the student[']s work box right after I gave it to him and never referred to it or checked it off once. I am also trying to teach socially appropriate behavior to the student such as not just walking up to people and randomly tickling them and not sitting on adult laps. *He will tickle the student and allow him to sit on his lap and those are behaviors I am trying to ride and replace and he has been reminded over and over.* He has also been on his phone a lot when outside with the student. The student is a runner and cannot be trusted. He saw the original e-mail I sent you and claim it was on the overhead but I do not believe it was. His student is often behind my desk and I think he read it while moving him from the area. He then went and discussed the e-mail with Mr. Chapman. I have confronted him (aid[e]) about it. I let him know that it is nothing personal only work related. I had talked to Mr. Mann and Mrs. Cooley.[4]

*Id.* at 1 (emphasis added).

On November 14, 2019, Levisay observed Curry in Ridgeway's classroom. *See* Levisay Observation Note, ECF No. 221-1, at 3–4. During that visit, Curry relayed to Levisay "that others in the room weren't happy with him." *Id.* at 4. The only coaching Levisay provided Curry was to follow the instructions of the teacher. *Id.* Levisay's note concluded with the statement, "[a]fter the observation I stopped and talked to Mr. Manns [sic] and he ensured [sic] me he would keep an eye on the situation." *Id.*

The record suggests that Ridgeway talked not only to Mann and Levisay regarding Curry but also to Assistant Principal Cooley. *See* Cooley Dep. 26–32, ECF No. 221-3. Cooley testified that she further reported concerns about Curry's unreceptiveness to Ridgeway's instruction to Mann. *Id.* at 31.

Whether Curry ever received any counseling from Ridgeway or Mann is contested. Ridgeway and Mann both testified that they talked to Curry about not allowing John Doe to sit on

---

[4] At the time of the events described herein, Clarence "Buddy" Chapman and Kristen Cooley were assistant principals at Milton Middle School.

his lap. Ridgeway Dep. 9:20–10:6, ECF No. 217-1 (testifying that she had spoken to Curry about it multiple times); Mann Dep. 17:4–10, ECF No. 217-2 (testifying that he counseled Curry about not letting John Doe sit on his lap in October 2019). Curry, on the other hand, testified that he was not counseled by anyone about allowing students to sit on his lap. Curry Dep. 35:12–16, 90:23–91:14.

Despite the foregoing, Curry received a favorable performance evaluation from CCBOE, signed by Cooley, on November 15, 2019. *See* Curry Evaluation, ECF No. 221-1, at 1–2.

One week later, on November 22, 2019, Cotton reported to Ridgeway that she walked into the sensory room contained within Ridgeway's classroom and found Curry molesting John Doe. Ridgeway Dep. 29:4–14

At Ridgeway's insistence, the two women went to Assistant Principal Cooley's office. *Id.* Cooley then called Mann, who joined Cooley, Ridgeway, and Cotton in Cooley's Office. Mann Dep. 23:2–7. Mann testified that all three women were visibly upset. *Id.* at 23:4–5, 24:10–14.

Per Mann's written report, Cotton explained that when she entered the sensory room "[John Doe] was straddling Mr. Curry, who was seated, and was 'grinding on him.' She stated they were face to face. That Mr. Curry had his arms around [John Doe]'s waist and [John Doe] had his arms around Mr. Curry's neck." Investigation Report 1, ECF No. 221-1, at 13–15.

Mann reported that he immediately had Cooley "retrieve Mr. Curry" and he made phone calls to the central Board Office. *Id.*; Mann Dep. 24:19–27:10. At Deputy Superintendent Tim Hardesty's instruction, Mann placed Curry on administrative leave, pending the outcome of his investigation in the Cotton and Ridgway's report. Mann then alerted the school's resource officer, Deputy Mike Talbott about the incident. Cotton and Mann also called Child Protective Services.

After Cotton reported her observations to Mann, she provided a written statement about what she observed:

> On Friday Nov. 22nd, 2019 around 2:15 pm I open the door to the snoezelen[5] room which is in our Room and Jason was sitting on the window ledge with [John Doe] straddling him crotch to crotch, [John Doe] was thrusting/jerking his hips Jason looked up at me with wide surprised eyes I stood there in shock speechless
>
> Jason let go of [John Doe], [John Doe] jumped up and ran out of the Snoezelen, I then told him what I originally went to tell him he sat there with his legs squeezed together like as if you had to pee really bad I then left the room and Jason came out grabbed [John Doe] and left our room, I went straight to Mrs. Ridgeway told her what I'd seen Then we both when to Mrs. Cooley's office and told her

Cotton Report, ECF No. 221-1, at 11–12.[6]

Ridgeway also completed a report which described a previous incident of John Doe sitting on Curry's lap in the "straddle position" in the sensory room:

> I walked into the sensory room in my classroom. Jason Curry was sitting on an armless chair. His student [John Doe] was sitting on his lap, face to face in a straddle position. Jason was holding [John Doe]'s hands and [John Doe] was bending backwards and Jason was pulling him backup.

Ridgeway Report 1, ECF No. 217 at 1. Although Ridgeway's report was completed on November 22, 2019, it states that the incident occurred on or around October 15, 2019. *Id.*

While Ridgeway later adopted the description of this October incident as akin to a non-sexual game of "upsy-daisy," Ridgeway Dep. 71:13–72:24, Mann testified that he asked her to fill out the report after asking if anything else had ever happened "sexually" or if there were previous

---

[5] The "snoezelen room" is what they called the sensory room inside of Ridgeway's classroom.

[6] In the report filed by Deputy Talbott, Cotton states that when John Doe got up from Curry's lap, Curry "had his legs pinched together as if he had to urinate or was hiding an erection." Cabell County Sherriff's Office Report 3, ECF No. 221-1, at 6–9. At her deposition, Cotton confirmed that she believed Curry had an erection at the time. Cotton Dep. 62:7–10.

situations "where he would be in that position," Mann Dep. 31:3–11. Regardless of how it is characterized, there was something about the November 22, 2019 incident that caused Ridgeway to remember and report the mid-October incident.[7]

Curry was also asked to write a statement about what happened in the sensory room that day. His brief statement read:

> I was in the sensory room with [John Doe] he was watching Disney + on my phone. While in the room he was sitting on my leg.

Curry Statement, ECF No. 217, at 62. As previously mentioned, Curry was placed on administrative leave that afternoon. The Cabell County Prosecutor charged Curry with Sexual Abuse in the Second Degree shortly after the November 2019 incident, and Curry was indicted in March 2021. Curry Dep. 52:21–24. To the Court's knowledge, those charges are still pending.

On January 8, 2020, CCBOE Superintendent Ryan Saxe sent Curry a letter finding "even if the criminal charges are removed, you have violated Policy 4210 Employee Code of Conduct and your actions unacceptable and will not be tolerated." Saxe Letter 1–2, ECF No. 221 at 25–26. The letter placed Curry on unpaid leave and informed Curry that Saxe would seek approval from the Board to terminate Curry's employment. *Id.* at 2. Curry testified that he remained on suspension until he resigned in mid-January 2020. Curry Dep. 28:18–29:23.

---

[7] Accusations have been made that Cotton lied about what she saw on November 22, 2019, because she wanted Curry's job. During her deposition, Cotton clearly stated those accusations were false. She testified both that she did not want Curry's job because she did not believe she could keep up with John Doe and that even if she did want Curry's job, she would not have been able to get it, because CCBOE jobs are "a lottery." Cotton Dep. 69:13–23. Ultimately, Cotton flatly denied making up the story about Curry molesting John Doe. *Id.* at 70:14–15. Moreover, although Ridgeway states that she no longer believes Cotton is telling the truth, she does not know for certain that the allegations are false. *See* Ridgeway Dep. 46:4–10.

John Doe's parents were informed of the November 22, 2019 incident the day it happened. Mann Dep. 33:7–19.[8] Jane Doe testified that they were not apprised of the October incident reported by Ridgeway until they met with the Cabell County Prosecuting Attorney in February 2020. Jane Doe Dep. 54:18–55:16.[9]

John Doe's parents allege that during the time Curry was his aide, John Doe engaged in increased sexual behaviors. Jane Doe Dep. 25:6–27:21, 36:9–16; J. Doe Dep. 45:1–46:21.[10] They further testified that those behaviors largely ceased once John Doe was no longer with Curry. Jane Doe Dep. 36:18–21, J. Doe Dep. 58:1–60:14. Jane Doe reported the same to John Doe's psychiatrist. *See* Dr. Bryant Melvin Dep. 48:17–53:6.

On the other hand, the expert retained by Defendant CCBOE, Dr. Lee Elizabeth Wachtel, has opined that John Doe did not experience an increase in sexual behavior during the time he was with Curry. *See* Wachtel Report, ECF No. 217-21.

---

[8] Jane Doe also testified that individuals within the school system shared that "they felt something was going on" and that "Jason was doing something to [John Doe.]" J. Doe Dep. 5:22–6:6. No follow up questions were asked about this testimony.

[9] Plaintiffs also assert that there two other concerning incidents involving John Doe that support their claims. First, John Doe was restrained by CCBOE employees on August 27, 2019. ECF No 221-1, at 18–19. Jane and J. Doe assert that they did not learn about this restraint until documentation was produced during this litigation. Second, Plaintiffs also allege that there was a "strange episode" during which Jason Curry had John Doe in the bathroom with the lights off. *See* Cotton Dep. 36:14-18. However, Cotton's characterization of the second incident is disputed by Ridgeway. *See* Ridgeway 85:7–86:10 (describing the lights as flickering for a couple seconds).

[10] J. Doe testified that at the time John Doe was engaging in these behaviors, he was not aware of Curry's molestation, and he attributed John Doe's increased sexualized behaviors to puberty. *See* J. Doe Dep. 58:1–60:14.

B. **Procedural History**

On January 14, 2021, Plaintiffs filed their original Complaint. ECF No. 1. The now-operative Amended Complaint was filed on October 6, 2021. ECF No. 45. Both Defendants filed motions to dismiss the Amended Complaint. ECF Nos. 47, 49.

On February 24, 2022, the Court granted in part and denied in part Defendant Curry's motion to dismiss. ECF No. 92. The Court denied Curry's requests to dismiss Counts I and V, but dismissed counts III, IV, VI, and VII. As such, the following counts remain as to Curry: Violation of 42 U.S.C. § 1983 (Count I); State Constitutional Tort (Count II); Disability Discrimination in Violation of West Virginia Human Rights Act (Count V); Civil Assault (Count VIII), and Civil Battery (IX).

Curry has now moved for summary judgment on all the counts that remain pending against him. ECF No. 209.

## II. LEGAL STANDARD

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete

evidence from which a reasonable juror could return a verdict in his [or her] favor[.]" *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his or her position. *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### A. Count I: Deprivation of Rights Under 42 U.S.C. § 1983

A plaintiff may bring a claim under § 1983 against any person, who under color of state law causes the plaintiff to be deprived of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983; *see West v. Atkins*, 487 U.S. 42, 48 (1988).

With respect to § 1983 claim based on a violation of the Fourteenth Amendment, the Supreme Court has elucidated that "the due process guarantee does not entail a body of constitutional law imposing liability whenever someone cloaked with state authority causes harm." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 (1998). Instead, such violations are only actionable when the state actor's abuse of power "shocks the conscience." *Id.*

Curry concedes that "it is clearly established that a teacher violates a student's 14th Amendment right to bodily integrity by sexually molesting them" but argues that Plaintiffs' § 1983 claim must be dismissed because (1) Plaintiffs cannot maintain a § 1983 claim against him in his official capacity; (2) Plaintiffs have not proffered sufficient facts to establish that Curry molested John Doe, and (3) Plaintiffs have not proffered sufficient facts to establish that John Doe suffered

damages as a result of Curry's Actions. Curry Mem. of Law 3–16, ECF No. 210. These arguments are addressed, and rejected, in turn.

1. Plaintiffs' Section 1983 claim is against Curry in his individual capacity.

First, Defendant Curry makes a second request to dismiss any official capacity claim against him pursuant to Section 1983. *See id.* at n.2. Plaintiffs have long been clear that their Section 1983 claim against Curry is asserted against him in his individual capacity. Plfs' Renewed Resp. to Curry's Mot. to Dismiss 7–8, ECF No. 53. Accordingly, Curry's request that the Court dismiss any claims against him in his official capacity is once again **DENIED AS MOOT**. *See* ECF No. 92, at 4 ("Accordingly, the motion to dismiss the claims in Curry's official capacity is DENIED AS MOOT.").

2. There is a genuine issue of material fact as to whether Curry molested John Doe.

Second, Curry argues that Plaintiffs' § 1983 claim fails because the Plaintiffs have not produced evidence to support their claim that Curry molested John Doe. *See* Curry Mem. of Law 3–9. Specifically, Curry argues (1) that Ridgeway testified that she did not believe the October 2019 incident was sexual in nature, and (2) that Cotton's account of the incident on November 22, 2019 is merely "consistent with John Doe's history of lap-sitting that was widely observed and well documented in his school records and WV Intellectual/Developmental Disabilities Waiver Program Records." *Id.* at 4–5.

Addressing Curry's arguments in reverse order, the Court finds that Cotton's accounts of November 22, 2019 describe Curry engaging in sexual contact with twelve-year-old John Doe. *See* Cotton Report 1; Cotton Dep. 53:4–54:8, 58:3–59:8. In fact, when Cotton was asked if she was "one hundred percent sure that the interaction between [John Doe] and Jason Curry was sexual in nature," Cotton responded in the affirmative. Cotton Dep. 60:8–11 ("I believe so, yes."); *see id.* at

61:16–62:10 (testifying that she believed Curry had an erection at when she walked in on him with John Doe).

Cotton's accounts of that day do not describe mere lap-sitting that is "consistent with John Doe's history," *see* Curry Mem. of Law 19, but rather detail an eyewitness account of harmful and offensive treatment of a disabled child.

Despite Curry's attempts to attack Cotton's credibility, *see* Curry Mem. of Law 9, Cotton flatly denied that she falsified her report, Cotton Dep. 70:14–15.[11] More importantly, Cotton's credibility is not appropriately determined by the Court on summary judgment. *Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218–19 (4th Cir. 2018) (noting that courts are not to "weigh the evidence or make credibility determinations" when deciding a motion for summary judgment); *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991) ("Whether or not Gray's testimony should be believed is a credibility determination that is not for us to make.").

Additionally, while the Court agrees that the Plaintiffs' evidence regarding the October 2019 incident is less substantial, it is plausible that a jury could determine the incident was sexually inappropriate in nature. Although Ridgeway has recently characterized the October 15, 2019 incident as benign, Mann testified that Ridgeway reported the incident after he asked her if anything else had ever happened "sexually." Mann Dep. 31:3–11. Moreover, if the jury finds that the November 22, 2019 incident occurred as Plaintiffs allege, it could find that the October incident was similarly abusive in nature.

In sum, viewing the evidence in the light most favorable to the Plaintiffs, it is evident there is a triable issue of fact regarding whether Curry molested John Doe.

---

[11] *See supra* Note 7.

3. <u>Curry is not entitled to summary judgment as a matter of law on damages.</u>

Third, Curry argues that he is entitled to summary judgment because "Plaintiffs do not establish that Curry's alleged misconduct caused any damages." Curry Mem. of Law 9.

Yet, in his memorandum, Curry recognizes that John Doe's parents have testified that their child engaged in increased sexualized behaviors around the time of the alleged molestation. *See* Curry Mem. of Law at 14 (citing Jane Doe Dep. at 16:26–17:21, 44:6–23, 52:14–54:16; J. Doe Dep. 59:9–23, 61:4–7). John Doe's parents reported the same to John Doe's psychiatrist. *See* Dr. Bryant Melvin Dep. 48:17–53:6, 87:7–8. Based on the foregoing, there is a clear dispute of fact regarding whether John Doe experienced behavioral changes after or around the time that Curry was working with him.

Beyond these claimed behavioral changes, as set forth above, a reasonable jury could find that Curry molested John Doe. As explained by the Court in its Memorandum Opinion and Order on Defendant Cabell County Board of Education's Motion for Summary Judgment, that bodily intrusion itself is a cognizable injury. ECF No. 281, at 15.

Having rejected each of Curry's arguments for dismissing the § 1983 claim, the Court finds that his motion for summary judgment as to Count I must be **DENIED.**

**B. Count II: Constitutional Tort Under Article III, § 10 of the West Virginia Constitution**

Under West Virginia law, "a private cause of action exists where a . . . governmental unit causes injury by denying that person rights that are protected by the Due Process Clause embodied within Article 3, § 10 of the West Virginia Constitution." Syl. Pt. 2, in part, *Hutchinson v. City of Huntington*, 479 S.E.2d 649 (W. Va. 1996).

Curry argues that the Court must dismiss Plaintiffs' Constitutional Tort because it is duplicative of their Section 1983 claim. Curry Mem. of Law 16.

Indeed, the West Virginia Constitution's Due Process Clause is generally considered to mirror the due process guarantees of the federal constitution. Nonetheless, the separate constitutional guarantees are not identical. *See Women's Health Ctr. of W. Va. v. Panepinto*, 446 S.E.2d 658, 663–64 (1993) ("Although our due process clause does not significantly differ in its terms from the language of the Fifth and Fourteenth amendments of the federal constitution, this Court has determined repeatedly that the West Virginia Constitution's due process clause is more protective of individual rights than its federal counterpart.") (footnote omitted); *YMCA of Parkersburg v. W. Va. Dep't of Health & Hum. Res.*, --- S.E.2d ---, 2023 WL 4838229, at *8 n.2 (W. Va. App. July 28, 2023) (Scarr, J., concurring).

Ultimately, Curry has no legal support for his position that individuals cannot pursue parallel claims under both federal and state constitutions. To be sure, such analogous claims are frequently pursued. As such, Curry's motion for summary judgment as to Count II is **DENIED**.[12]

## C.  Count V: Disability Discrimination in Violation of the West Virginia Human Rights Act

The West Virginia Human Rights Act ("WVHRA") makes it unlawful for any agent or employee of a place of public accommodations to "[r]efuse, withhold from or deny to any individual because of his or her . . . disability, either directly or indirectly, any of the accommodations, advantages, facilities, privileges or services of the place of public

---

[12]  Plaintiffs agree that West Virginia law "does not permit double satisfaction for a single injury," Syl. Pt. 7, *Harless v. First Nat'l Bank*, 289 S.E.2d 692 (W. Va. 1982), and "acknowledge they cannot recover duplicative damages," ECF No. 221, at 19.

accommodations[.]" W. Va. Code § 5-11-9(6)(A). It appears to be undisputed that a public school constitutes a "place of public accommodation" and that John Doe is an individual with a disability.

Defendant Curry's motion for summary judgment as to this claim simply states, "for the same reasons Plaintiff's Section 1983 claims fail due to Plaintiffs' failing to proffer sufficient facts to establish that Curry molested John Doe, Plaintiffs' WVHRA discrimination claim predicated on such unsupported molestation allegations likewise fails and must be dismissed." Curry Mem. of Law 19.

Because the Court finds that Plaintiffs *have* produced sufficient evidence regarding Curry's alleged molestation of John Doe, *see supra* Part III.A.2, Curry's motion for summary judgment with respect to Count V must similarly be **DENIED**.

### D. Count VIII: Civil Assault

To prove a claim for civil assault, a plaintiff must show "(a) [the defendant] act[ed] intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." *W. Va. Fire & Cas. Co. v. Stanley*, 602 S.E.2d 483, 495 (W. Va. 2004) (quoting Restatement (Second) of Torts § 21 (1965)).

Curry submits that the Court must dismiss Plaintiffs' civil assault claim because it is duplicative of the battery claim in Count IX and because there is no evidence that Curry placed John Doe in imminent apprehension of harmful or offensive contact. *See* Curry Mem. of Law 16–18. In response, Plaintiffs state that they "no longer pursue a claim for Civil Assault in Count VIII."

-16-

In view of Plaintiffs' response, Defendant Curry's motion for summary judgment as to Count VIII is **GRANTED**.

### E.  Count IX: Civil Battery

To prevail on a claim for civil battery under West Virginia law, a Plaintiff must prove "(a) [the defendant] act[ed] intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a conduct, and (b) a harmful contact with the person of the other directly or indirectly results." *Stanley*, 602 S.E.2d at 494 (quoting Restatement (Second) of Torts, § 13 (1965)).

Curry submits that summary judgment is warranted as to Plaintiffs' battery claim because Plaintiffs have "fail[ed] to demonstrate that Curry molested John Doe rather than allowed him to sit on his lap." Curry Mem. of Law 18.

As described above, there is an apparent question of material fact as to whether Curry acted to cause harmful or offensive contact with John Doe. *See supra* Part III.A.2. Accordingly, Curry motion for summary judgment as to Count IX is **DENIED.**

## IV. CONCLUSION

In light of the foregoing, Jason Curry's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** The Motion is **GRANTED** insofar as it asks the Court to dismiss Count VIII (Civil Assault) of the Amended Complaint. The Motion is otherwise **DENIED.**

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

          ENTER:      September 18, 2023

          ROBERT C. CHAMBERS
          UNITED STATES DISTRICT JUDGE